# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| TANYA AMMONS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 08 C 5663 |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| METROPOLITAN WATER ) | |
| RECLAMATION DISTRICT OF ) | |
| GREATER CHICAGO, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION & ORDER

This case reaches the court on a motion for reconsideration of its previous summary judgment ruling. In this case, Ammons argues under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., that her employer, the Metropolitan Water Reclamation District of Greater Chicago (the "MWRD"), failed to accommodate her disability. After becoming disabled, Ammons sought reassignment to one of two vacant positions at the MWRD, but the MWRD assigned both of those positions to other employees. She contends that both of the positions could have reasonably accommodated her disability, and that the MWRD failed to engage in the interactive process to accommodate her disability in good faith.

Relying on *Conner v. Illinois Department of Natural Resources*, 413 F.3d 675 (7th Cir. 2005), the court had initially granted summary judgment to the MWRD on the ground that Ammons had not exhausted her administrative remedies as to the two vacancies, which the MWRD filled with the other employees after Ammons had filed her

administrative charge with the EEOC. Because a failure to accommodate claim is of a continuous nature (and, eventually, could include inquiries into a breakdown of the interactive process), the court vacated that ruling in an opinion issued on November 9, 2011 and held that *Conner* did not govern this case. Because the inquiry into a failure to accommodate claim requires, as a threshold matter, that the court make sure that a reasonable accommodation existed for potential reassignment, the court heard oral argument on December 7, 2011 to assess whether either the centrifuge or storeroom positions were reasonable accommodations for Ammons. The court now reconsiders its previous grant of summary judgment to the MWRD but reaffirms, on different grounds, the grant of summary judgment.

## I. BACKGROUND

The undisputed facts of this case are as follows. Tanya Ammons was hired by the MWRD in July 1986 in the MWRD's Maintenance Laborer A ("MLA") civil service classification. The MWRD operates seven wastewater treatment facilities, including the Calumet Plant where Ammons was employed. Ammons took an unpaid leave of absence beginning on December 21, 2006 due to depression. On or around December 28, 2006, she informed the MWRD that, in anticipation of her eventual return to work, she wished to begin the interactive process to receive a workplace accommodation.

Because the MWRD had eliminated Ammons' previous position (in the Buildings and Grounds department) while she was on disability leave, Ammons could not seek to be reinstated to that position. Thus, on February 8, 2007, after the interactive process had begun, Ammons requested that she be reassigned to either a centrifuge position or a storeroom position as an accommodation for her disability. Both of these positions

2

would be vacant at points during the interactive process,[1] and Ammons had the most seniority of the employees who requested reassignment to either of these two positions.

Around the same time, the MWRD requested an identification of Ammons' workplace restrictions from her psychiatrist. In letters dated February 2, 2007 and February 13, 2007, Ammons' psychiatrist, Dr. Howard Herman, informed the MWRD that Ammons could not work in or around tanks, platforms, or water more than two feet deep, travel more than five miles to work, do concrete and brick work, climb ladders, or do utility line excavation and backfill. According to her doctor, her condition also "prevent[ed] her from safely and effectively operating high power tools and equipment such as sledge hammers, electric drills and air powered hammer drills and generators." (Pl.'s Stmt. of Add'l Facts, ECF No. 94, Ex. KK.) Dr. Herman stated that, given Ammons' disability, Ammons could not be trained to perform these tasks, and that "[a]ny denial of the requested accommodation would in my opinion jeopardize Ms. Ammons's safety and well being." (*Id.*)

Ammons' testimony is consistent with these restrictions. She admitted that she could perform only "the duties of an MLA that consist of the cleaning, hauling, garbage detail, cleaning of the outline station, cleaning of the floors and driving" and that she could not "work in or around deep waters, or do any trades or Masonry duties . . . ." (Def.'s 56.1 Stmt., Tab 38.) She admitted that a "high power tool" is any tool that includes a motor (Def.'s 56.1 Stmt., Tab 4, at 271), and that the centrifuge and storeroom positions were the only "reasonable ADA accommodations" that the MWRD should have

---

[1] Vacancies in the centrifuge and storeroom positions arose on July 28, 2006 and April 30, 2007, respectively.

provided to her from March 19, 2007 to the present. (*See* Pl.'s Supp. Resp. to Def.'s First Set of Interrogatories at 7 ¶ 15, ECF No. 71-20.)

On March 12, 2007, the MWRD completed a preliminary analysis of Ammons' request for a workplace accommodation, but stated that a final determination would not be made until Ammons was cleared to return to work. On March 19, 2007, Dr. Herman informed the MWRD by letter that "I am releasing [Ammons] to go back to work with the ADA accommodations [referred to in previous communications to the MWRD]." (*See* Def 56.1 Stmt., Tab 28.) That day, a physician's assistant at Concentra Medical Centers performed a return to work physical of Ammons, which indicated that Ammons had "extreme limitations" and that she could return to work only with the accommodations "as outline[d] by her psychiatrist." (*See* Def.'s 56.1 Stmt., Tab 29.)

On April 18, 2007, Ammons filed charges of discrimination with the Illinois Department of Human Rights ("IDHR") and the Equal Employment Opportunity Commission ("EEOC"), alleging that "[the MWRD] has refused to accommodate my medical restrictions and will not allow me to return to work . . . ." (*See* Def.'s 56.1 Stmt., Tab 49.) On May 2, 2007, Patrick Foley, the MWRD's Director of Human Resources, sent Ammons a letter informing her that it would not accommodate her disability. Specifically, the letter stated that Ammons was "unable to perform the essential functions of [the MLA] classification in the Maintenance and Operations Department and the Purchasing Department, with or without a reasonable accommodation . . . ." (Pl.'s Stmt. of Add'l Facts, Ex. CC.) These were the departments in which the MWRD housed the centrifuge and storeroom positions, respectively. The letter asked Ammons to advise the MWRD "should [her] condition change in the future to allow [her] to be able to perform

the essential functions" of the MLA positions housed in those departments. (*Id.*) The MWRD received no notice of any such changes in Ammons' condition before it assigned other employees to the centrifuge and storeroom positions.

*The Centrifuge Position*

The MWRD filled the centrifuge vacancy by transferring Edward Watts to that position on June 11, 2007; Watts had requested a transfer into the position on May 31, 2006, almost two months before the position became vacant on July 28, 2006. Although Ammons was the most senior of those who had requested reassignment to the centrifuge position, Section 14G of the MWRD's governing collective bargaining agreement provides:

> Unless otherwise stated in this section, any request for transfer which has been submitted less than thirty calendar days prior to the occurrence of a vacancy shall not normally be considered for transfer to such vacancy until similar requests submitted thirty or more days prior to the occurrence of the vacancy have been satisfied. (Def.'s 56.1 Stmt., Tab 9, at 15.)

It is undisputed that Ammons made her request to receive a reassignment to the centrifuge vacancy less than thirty calendar days prior to its availability, and indeed made her request after the centrifuge position became available. Watts was employed in the centrifuge position from July 11, 2007 until October 24, 2009, when the MWRD shut down the centrifuge building and transferred Watts to work in the digester room.

The centrifuge position primarily involves cleaning, taking centrifuge samples, and taking machine readings. Much of the required cleaning in the centrifuge position was done with hoses and squeegees, but the MLA holding this position sometimes needed to walk near tanks or platforms to perform certain aspects of this cleaning.

Al Nichols, an Assistant Chief Operating Engineer, has acted in a supervisory capacity in Section 834 of the Maintenance and Operations department, which houses the centrifuge position, since 1997. Only one MLA from Section 834 has ever been assigned to the centrifuge position at any given time. Nichols testified that there are platforms throughout the centrifuge building. Nichols averred that every MLA assigned to Section 834 works near platforms on a daily basis, and that all MLAs, including Watts, worked around tanks and climbed ladders on a regular basis while performing their duties. Nichols testified that walking around tanks and platforms is an essential function of the centrifuge position.

*The Storeroom Position*

The MWRD filled the storeroom vacancy on August 27, 2007 with William Jones, who is employed in the storeroom position to this day. The duties of the storeroom position involve "[g]eneral maintenance duties, including sweeping, mopping, cleaning the offices, emptying garbage, filling orders, and stocking equipment." (*See* Def.'s 56.1 Stmt., Tab 4, at 358.) Jones describes his job responsibilities as including housekeeping, material issue, material movement, and window washing or cleaning. To stock equipment, the position requires one to climb a stepladder with fixed rails on the sides to access shelves. Ammons admits that her restrictions barred her from having to climb ladders. (*Id.* at 360, 381.) On at least some occasions, Jones uses a motorized forklift truck; he also attended a training session where he was taught to operate a forklift. The storeroom position requires one to operate other tools such as a motorized overhead crane and a motorized floor bluffer. Only one MLA is assigned to the storeroom. Patricia McCallister, the principal storekeeper of the Calumet storeroom, testified that (1) the

essential functions of the storeroom position could not be performed if Ammons were reassigned to the storeroom position; and (2) an additional employee would have to be hired to perform these functions if Ammons were reassigned there.

* * *

After the MWRD denied Ammons' requests to be reassigned to the centrifuge or storeroom position, Ammons wrote a letter to an EEOC investigator on May 28, 2007 expressing concern that the MWRD still had not accommodated her disability and complaining that the MWRD was filling vacant positions with individuals with less seniority than she had. On June 21, 2007, the MWRD sent Ammons a letter stating that the MWRD could not identify any reasonable accommodation that would allow her to safely perform the essential functions of any position in the MLA classification.

On September 28, 2007, Ammons obtained another letter from Dr. Herman which sought to clarify the scope of his restrictions. This letter said that "Ammons is able to perform the actual job duties she was previously performing," but that she still could not "operate high power tools, work on or near scaffolds or assist in brick layers [sic] work." (*See* Def.'s 56.1 Stmt, Tab 25.) The MWRD did not offer Ammons an accommodation as a result of this clarification from Ammons' psychiatrist. Nor did the MWRD provide an accommodation when Dr. Herman wrote another letter on January 6, 2010, after this litigation commenced, significantly reducing Ammons' restrictions.

After the interactive process failed to yield an accommodation for Ammons, the EEOC issued Ammons a right to sue letter on August 11, 2008. Ammons filed this lawsuit on October 3, 2008.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When reviewing a motion for summary judgment, the court should view all evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. *See Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). However, the party who bears the burden of proof on an issue may not rest on the pleadings or mere speculation, but must affirmatively demonstrate that there is a genuine issue of material fact that requires a trial to resolve. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). The evidence presented must comport with the Federal Rules of Evidence and be admissible at trial, *United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010), and it must consist of affidavits or declarations "made on personal knowledge, set[ting] out facts that would be admissible in evidence, and show[ing] that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## III. ANALYSIS

A failure to accommodate claim under the ADA requires three elements. The employee must show that "(1) she is a qualified individual with a disability; (2) the defendant was aware of her disability; and (3) the defendant failed to reasonably accommodate her disability." *Gratzl v. Office of Chief Judges of 12th, 18th, 19th and 22th Judicial Circuits*, 601 F.3d 674, 678 (7th Cir. 2010). "As to the third element, the 'ADA requires that employer and employee engage in an interactive process to determine a reasonable accommodation.'" *E.E.O.C. v. Sears, Roebuck, & Co.*, 417 F.3d 789, 797

(7th Cir. 2005) (quoting *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633 (7th Cir. 1998)). And if the disabled employee demonstrates that her disability was not reasonably accommodated, the employer is liable when "it bears responsibility for the breakdown of the interactive process." *Id.* (citing *Beck v. Univ. of Wisc. Bd. of Regents*, 65 F.3d 1130, 1137 (7th Cir. 1996)). Here, there is no dispute that Ammons' depression constituted a "disability" under the ADA, or that the MWRD was aware of Ammons' disability. Ammons' claim is that the MWRD engaged in the interactive process in bad faith, thereby causing a breakdown in the interactive process which led to the MWRD's failure to accommodate Ammons.

**Whether Ammons is a "Qualified Individual" Under the ADA**

Before the court can consider whether the MWRD engaged in the interactive process in good faith, however, Ammons must first provide evidence that she is a qualified individual under the ADA. *See Baert*, 149 F.3d at 632; *Gratzl*, 601 F.3d at 678. Specifically, it is Ammons' burden to show that a reasonable accommodation existed for her at the MWRD. *See, e.g.*, *Mays v. Principi*, 301 F.3d 866, 870 (7th Cir. 2002) ("The plaintiff cannot seek a judicial remedy for the employer's failure to accommodate her disability without showing that a reasonable accommodation existed."). If no reasonable accommodation existed for Ammons, whether or not the MWRD participated in the interactive process "conscientiously" or in "good faith" is irrelevant. *Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001).

To demonstrate that Ammons is qualified for relief under the ADA, she must provide evidence that she is capable of performing the essential functions of the positions she seeks. *See Kotwica v. Rose Packing Co., Inc.*, 637 F.3d 744, 748 (7th Cir. 2011)

9

(noting that the ADA "defines a 'qualified individual with a disability' as 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires'" (quoting 42 U.S.C. § 12111(8) (amended 2009))); *See Winfrey v. City of Chi.*, 259 F.3d 610, 615 (7th Cir. 2001). Additionally, reassigning Ammons cannot impose an undue hardship on the MWRD by forcing the MWRD to (1) strip the essential functions from a job; or (2) create a new position. *Gratzl*, 601 F.3d at 680.

At oral argument, Ammons asserted that several reasonable accommodations were available while she engaged in the interactive process. These accommodations included the centrifuge position, the storeroom position, and various "ultimate vacancies" that had been provided to employees with less seniority than Ammons. (*See* Oral Arg. Transcript of Dec. 7, 2011 at 31-32.) Thus, Ammons contends that she is a qualified individual under the ADA. As discussed below, the court disagrees.

### a. The Centrifuge Position

The MWRD argues that the centrifuge position was not a reasonable accommodation for Ammons for two reasons. First, it argues that the governing collective bargaining agreement prevented Ammons from having an entitlement to the centrifuge position under the ADA. And second, it argues that Ammons could not perform the essential functions of the centrifuge position. While the court disagrees with the MWRD's conclusion that the collective bargaining agreement immunized it from liability, the court nonetheless agrees with the MWRD that, given Ammons' limitations, she could not have performed the essential functions of the centrifuge position.

*The Collective Bargaining Agreement Did Not Immunize the MWRD From Accommodating Ammons in the Centrifuge Position*

Section 14G of the collective bargaining agreement states that: "Unless otherwise stated in this section, any request for transfer which has been submitted less than thirty calendar days prior to the occurrence of a vacancy shall not normally be considered for transfer to such vacancy until similar requests submitted thirty or more days prior to the occurrence of the vacancy have been satisfied." (Def.'s 56.1 Stmt. at 5 ¶ 13.) Watts—who received the centrifuge transfer—applied for that transfer on May 31, 2006, well over thirty days prior to when the centrifuge position became vacant on July 28, 2006. Ammons requested the reassignment to centrifuge on February 8, 2007—well after the centrifuge vacancy had been announced. Based on this, the MWRD argues that reassigning Ammons to the centrifuge position would have conflicted with Watts' rights under the collective bargaining agreement, and that reassigning her there would have been impermissible under the ADA.

However, Section 14G of the collective bargaining agreement is not a seniority provision that trumps Ammons' rights under the ADA; rather, it is a provision governing transfer requests. The cases cited by the MWRD to support its argument regarding the collective bargaining agreement stand for the proposition that reassignments under the ADA cannot trump *seniority* provisions under collective bargaining agreements. *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 912 (7th Cir. 1996) (noting that an employee does not have a right to superseniority over other employees as a result of a disability); *Eckles v. Consol. Rail Corp.*, 94 F.3d 1041, 1051 (7th Cir. 1996) (noting that a collective bargaining agreement rule to bump a more *senior* employee in favor of a disabled employee was purely discretionary). Indeed, the Seventh Circuit has not adopted

a general rule that *all* collective bargaining agreement provisions trump the ADA rights of employees; rather, its "conclusion is limited to individual seniority rights and should not be interpreted as a general finding that all provisions found in collective bargaining agreements are immune from limitation by the ADA duty to reasonably accommodate." *Eckles*, 94 F.3d at 1051-52. Section 14G is less about seniority than it is about determining priority for certain transfer requests. The MWRD admits as much,[2] and the provision is not in the seniority section of the collective bargaining agreement, but rather in the section governing transfers. Thus, Section 14G, even if applicable, would not trump Ammons' rights under the ADA.

Moreover, it is not entirely clear that the collective bargaining agreement barred the MWRD from reassigning the centrifuge position to Ammons. First, one might argue that a reassignment associated with a disability is wholly distinct from a request to transfer. Second, the collective bargaining agreement says that requests for transfer submitted less than thirty calendar days prior to a vacancy are not *normally* considered until other requests are filled. It is not clear what "normally" means here, and nothing in the record clarifies its meaning. Under the circumstances, the court cannot conclude as a matter of law that the collective bargaining agreement prevented the storeroom position from being a reasonable accommodation.

---

[2] In its 56.1 (a)(3) statements of material fact at paragraph 13, the MWRD stated that, "While voluntary transfers of MLA's under the CBA are generally made based on seniority, other transfer provisions contained in the CBA trump an MLA's overall seniority, such as paragraph 14G of the CBA . . . ." This effectively represents a concession that Section 14G is not a seniority provision at all.

*Ammons Cannot Perform the Essential Functions of the Centrifuge
Position, With or Without Reasonable Accommodation*

Nonetheless, even if the collective bargaining agreement does not present a barrier to Ammons' failure to accommodate claim, Ammons still must demonstrate that, "with or without reasonable accommodation, [she] can perform the essential functions" of the centrifuge position. 29 C.F.R. § 1630.2(m); *see Basith v. Cook Cnty.*, 241 F.3d 919, 927 (7th Cir. 2001) (noting the same). In determining the essential functions of a job, the court may consider, among other things, (1) the employer's judgment as to which functions are essential, (2) the amount of time spent on the job performing the function, (3) the effects on the employer of not requiring the employee to perform the function, and (4) the work experience of past or current employees in the same job or similar jobs. *See* 29 C.F.R. § 1630.2(n)(3); *Basith*, 241 F.3d at 927.

Here, the MWRD provides evidence that an essential function of the centrifuge position entails work around platforms and tanks. If working around or near tanks or platforms is an essential function of the centrifuge position, this presents a problem for Ammons, as Dr. Herman's restrictions, at the relevant time,[3] expressly forbade her from working "in or around tanks or deep water" (Pl.'s Stmt. of Add'l Facts, Ex. NN) or from "working near platforms." (Pl.'s Stmt. of Add'l Facts, Ex. KK.)

With regard to the employer's judgment of the centrifuge position's essential functions, the affidavits and testimony of Al Nichols establish that walking around tanks and platforms was unavoidable in the centrifuge position, and that doing so was an

---

[3] Dr. Herman's letters of February 2, 2007 and February 13, 2007 indicated the restrictions that were in effect at the time the MWRD filled both the centrifuge vacancy and the storeroom vacancy. Dr. Herman's subsequent letters seeking to clarify Ammons' restrictions were all written when the centrifuge and storeroom positions were no longer vacant, and the ADA does not allow employers to bump employees from previously-filled positions. *See Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996).

13

essential function of the position. (*See* Nichols Affidavit ¶ 9, 11.) Photographs in the record, moreover, indicate that platforms exist throughout the centrifuge building. Even though the primary duties of the centrifuge position centered on cleaning, taking centrifuge samples, and taking machine readings (*see* Def.'s 56.1 Stmt., Tab 52, at 38-39), Nichols' testimony indicates that cleaning duties took place near platforms or tanks (*see id.* at 43, 48-50, 74-81, 85), and that these duties could take place for minutes or hours each day. (*See* Nichols Affidavit ¶ 10.) Eliminating work near tanks or platforms from the centrifuge position would have meant that there "would not be enough heavy manual laborer tasks left" for the centrifuge employee to remain busy on a daily basis. (Def.'s 56.1 Stmt., Tab 52, at 158, 190-91.)

That the MWRD viewed movement around tanks and platforms to be an essential function of the centrifuge position is corroborated by its internal memoranda circulated during the interactive process. In a March 2, 2007 memo from Osoth Jamjun, the Chief of Maintenance and Operations, to Patrick Foley, Jamjun wrote that an essential function of an MLA in centrifuge included "duties . . . climbing in and out of and working around process tanks and platforms to clean and maintain them . . . ." (Def.'s 56.1 Stmt., Tab 30.)

The court must accord deference to the employer's determination of the essential functions of a job. *Peters v. City of Mauston*, 311 F.3d 835, 845 (7th Cir. 2002) (noting that the court does not "second-guess the employer's judgment as to the essential functions"). "Although we look to see if the employer actually requires all employees in a particular position to perform the allegedly essential functions, we do not otherwise second guess the employer's judgment in describing the essential requirements for the job.'" *Basith*, 241 F.3d at 928 (quoting *DePaoli v. Abbott Labs.*, 140 F.3d 668, 674 (7th

Cir. 1998)). In general, therefore, the court defers to the employer's determination of essential functions "so long as the employer's reasons are not pretextual." *Basith*, 241 F.3d at 929.

To survive summary judgment, then, Ammons "must offer sufficient evidence to show [that] the employer's understanding of the essential functions of the [centrifuge position] is incorrect," *Id.* at 928-29. She has not done so. None of Ammons' proffered evidence seriously undermines the MWRD's claim that walking near platforms and tanks is an essential function of the centrifuge position, or indicates that such a claim by the MWRD may be pretextual. Ammons provides testimony that an MLA's responsibilities are dependent on what is assigned to the MLA by her direct supervisors. (*See, e.g.*, Garelli Dep. at 173-74 (noting that it is up to the foremen to assign MLAs to their jobs); Foley Dep. at 493 (noting that "employees are assigned specific duties by their supervisors").) But this testimony does nothing to rebut Nichols' testimony that working near tanks or platforms was an essential function of the centrifuge position. Nichols testified that the requirements of the centrifuge position were "pretty well set" (Nichols Dep. at 122), and Nichols, as one of the lead supervisors of the entire Maintenance and Operations department, provided directives to lower-level supervisors who managed centrifuge employees. Unless Ammons provided evidence of (1) a direct supervisor of a centrifuge employee; or (2) a centrifuge employee who could attest to the fact that centrifuge employees were not actually required to walk around tanks or platforms in performing their everyday duties, Ammons cannot meet her burden. The closest Ammons comes to this is evidence from one MWRD employee stating that the centrifuge employee did not have to work *in* tanks. (*See* DeLeon Dep. at 67.) This, however, is no

different from Foley's testimony, which conceded that the centrifuge employee generally did not need to go inside of tanks; the employee just needed to walk *around* them at times to clean them and perform other tasks. Ammons' cited evidence does nothing to refute the evidence that a centrifuge employee needed to work around platforms as an essential function of the job.

Finally, although Ammons argues that "the Defendant's employees have conceded at their depositions that one did not have to be able to perform all of the essential functions of either a MLA or a MLAS in order to hold either of [the centrifuge and storeroom] positions," (Pl.'s Mem. in Opp. to the Def.'s Mot. For Summ. J., ECF No. 100, at 17), this does nothing to salvage her claim. The specification for the MLA classification lists numerous essential functions that may or may not be part of individual MLA positions, including the centrifuge and storeroom. (Pl.'s 56.1 Stmt., Tab 8.) Even assuming that such concessions were made by MWRD employees at their depositions, they do not suggest that walking in or around tanks and platforms was not an essential function of the centrifuge position.

Given that Ammons has failed to meet her burden of rebutting the MWRD's contention that walking near tanks and platforms is an essential function of the centrifuge position, she cannot convince a reasonable trier of fact that she is a qualified individual with a disability with respect to that position. Reassigning Ammons to the centrifuge position would have imposed an undue hardship on the MWRD by forcing it to eliminate one or more of the position's principal duties. *See Gratzl*, 601 F.3d at 680.

### b. The Storeroom Position

The general duties of the storeroom position involve "[g]eneral maintenance duties, including sweeping, mopping, cleaning the offices, emptying garbage, filling orders, and stocking equipment." (*See* Def.'s 56.1 Stmt., Tab 4, at 358.) There is no dispute that Ammons could perform many of these functions. However, the MWRD argues that Ammons is unable to perform certain essential functions of the storeroom position relating to cleaning and stocking equipment. Specifically, the MWRD argues that (1) Ammons would have had to climb ladders in the storeroom; and (2) Ammons would have had to operate power tools in the storeroom.

In addition to Dr. Herman's restriction preventing Ammons from working near platforms, his restrictions forbade her from climbing ladders and from operating "high power tools and equipment." (Pl.'s Stmt. of Add'l Facts, Ex. KK.) Ammons admitted that she could not climb "portable stairs" or ladders in the storeroom, and she admitted that high power tools include anything that operates using a motor. Thus, if the essential functions of the storeroom position include the use of motorized power tools or climbing "portable stairs" or ladders, as the MWRD asserts, Ammons would not be qualified under the ADA to be reassigned to the storeroom.

It is undisputed that only one MLA works in the storeroom, and that William Jones is that MLA. Jones avers that he "climbed ladders to get access to shelves" and "operated power tools and equipment such as forklifts, overhead cranes, and motorized pallet stackers on a regular basis . . . ." (Jones Affidavit ¶ 3.) Jones further avers that these functions were generally performed by him every day. (*See id.*)

Patricia McCallister, the principal storekeeper of the storeroom and Jones' supervisor, corroborates Jones' assessment of his duties. She avers that Jones climbs ladders and operates power tools and equipment on a regular basis. (McCallister Affidavit ¶ 6.) Pictures of a forklift, motorized pallet stacker, and overhead crane are attached to McCallister's affidavit, and Jones confirms that he used the pictured tools as a storeroom employee. (*See* Jones Affidavit ¶ 5.)

Once again, Ammons has failed to rebut the MWRD's contention that climbing ladders and operating high power tools are essential functions of the storeroom position. She furnishes no affidavits or testimony from individuals who have either worked in the storeroom or supervised storeroom employees indicating otherwise. She also provides no evidence suggesting that the MWRD's explanation of these essential functions is pretextual.

Reassigning Ammons to the storeroom position, therefore, would have imposed an undue hardship on the MWRD. Employers are not required under the ADA significantly to alter existing positions to accommodate a disabled employee. *Dvorak v. Mostardi Platt Assocs., Inc.*, 289 F.3d 479, 484 (7th Cir. 2002) ("An employer is not required to modify, reduce or reallocate the essential functions of a job to accommodate an employee."). The MWRD would have had to assign an additional employee to the storeroom had it reassigned Ammons there, since an additional person would have been needed to compensate for the shortfall of labor that would result from accommodating Ammons' restrictions. (Def.'s 56.1 Stmt. at 24 ¶ 66.) This, too, would have placed more than a *de minimis* burden on the MWRD, meaning that the storeroom position was not a reasonable accommodation under the ADA. *See Rodriguez v. City of Chi.*, 156 F.3d 771,

779 (7th Cir. 1998). Accordingly, as with the centrifuge position, Ammons is not a qualified individual for ADA purposes with respect to the storeroom position.

### c. Ultimate Vacancies Asserted by Ammons at Oral Argument

Finally, Ammons argues that various "ultimate vacancies" could have reasonably accommodated her disability. Specifically, she refers the court to Tab 52 of the MWRD's summary judgment filing, which lists several MLA positions into which various MWRD employees received transfers while Ammons sought an accommodation. But Ammons fails to produce any evidence suggesting that she was qualified to perform the essential functions of any of those positions. Indeed, during oral argument, Ammons admitted that she had refrained from taking discovery on the issue of whether or not any of the positions listed in Tab 52 could have reasonably accommodated her. (*See* Oral Arg. Transcript of Dec. 7, 2011 at 35.) Because producing such evidence is Ammons' burden at summary judgment, *see Mays*, 301 F.3d at 870, Ammons has not created a genuine issue of material fact as to these additional positions.

\* \* \*

Because Ammons cannot convince any reasonable jury that she can perform the essential functions of any MWRD positions she seeks, she is not a qualified individual under the ADA for the purposes of this action. For this reason, Ammons' claim fails as a matter of law, and the court does not need to reach the question of whether or not the MWRD participated in the interactive process in good faith. Where an ADA plaintiff cannot show at summary judgment that a position was available that could have accommodated her disability, the employer's good faith participation in the interactive process becomes irrelevant. *Id.* at 871 ("[W]hen no reasonable accommodation is

possible the failure to jaw about accommodation is harmless."). Ammons' failure to accommodate claim must fail.

## IV. CONCLUSION

For the reasons stated above, the court reconsiders its previous ruling granting summary judgment to the MWRD. On reconsideration, summary judgment is again granted to the MWRD.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: March 1, 2012